**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHELLE R. ALEMANY,** | : | **Case No. 1:04cv501** |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | **MEMORANDUM AND OPINION** |
| **RISER FOODS COMPANY, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

This matter arises on a *Motion for Summary Judgment* (Doc. # 16) filed by Defendants Riser Foods Company d/b/a Giant Eagle, Inc. and Giant Eagle, Inc. (collectively, "Giant Eagle"). Giant Eagle seeks summary judgment against Plaintiff Michelle Alemany ("Alemany") on her claim for common law sexual harassment, which is her only claim in this lawsuit. Alemany filed a brief in opposition to Giant Eagle's motion for summary judgment (Doc. # 25), and Giant Eagle filed a brief in reply (Doc. # 26). Accordingly, this matter is ripe for adjudication. For the reasons articulated below, Giant Eagle's motion for summary judgment is **GRANTED**. This case is, therefore, **DISMISSED**.

## I. BACKGROUND

The following facts are not in dispute. Giant Eagle owns and operates supermarkets around Northern Ohio. Alemany became employed as a part-time cashier at Giant Eagle's Cleveland Heights location on November 16, 2002, working pursuant to a Collective Bargaining Agreement. At the time Alemany began working at the Cleveland Heights Giant Eagle, an employee named

Dwight St. Clair ("St. Clair") was already working as a bagger at that location. St. Clair is a mentally-challenged individual who was assisted in his employment by a job coach from the Cuyahoga County Board of Mental Retardation. Alemany alleges in this lawsuit that St. Clair sexually harassed her, and that Giant Eagle is liable for the harassment because it knew, or should have known, that St. Clair had a past history of sexually harassing behavior and failed to prevent the harassment alleged by Alemany.

The first and only time Alemany complained about St. Clair to store management occurred on February 10, 2003, when she told store co-manager William Zirm ("Zirm") that St. Clair had been grabbing her hand, asking her to go out with him, and repeatedly telling her that she was pretty.[1] Zirm informed Alemany that the Human Resources Manager, Jackie Lenson ("Lenson"), would normally receive such complaints, but that Lenson was not working that day. Zirm asked Alemany if she wanted him to do something "right now," but she decided to wait until Lenson returned to work. Zirm told Alemany to avoid St. Clair for the remainder of the day.

On February 14, 2003, the date of Alemany's next shift, Alemany met with Lenson and submitted a written statement setting forth her allegations against St. Clair. In her statement, Alemany wrote that on February 10, 2003, St. Clair was grabbing her hands as he helped her bag groceries, and that she was worried that "he could just as well grab something else of mine." She

[1] Alemany also claims that, prior to going to management, she reported St. Clair's behavior several times to a "senior cashier" at the store, Marietta Ford ("Ford"). Ford, however, is a cashier at the store and, regardless of her tenure as a cashier, was not management. Notice to her simply cannot constitute notice to Giant Eagle. In addition, Ford stated in her deposition that she does not even remember Alemany working at the store, she does not remember St. Clair saying anything of a sexual nature, and she does not remember whether St. Clair engaged in any inappropriate touching of Alemany. The Court, therefore, does not consider Alemany's alleged complaints to Ford to be relevant to its analysis.

told him to stop three times. In addition, she wrote that, from the first day she started working at Giant Eagle, St. Clair "couldn't stop grabbing my hand," and that "a number of times" he called her pretty and asked her to go out with him. Alemany's written statement also indicates that on February 7, 2003, she came to the store with her daughter, and St. Clair asked her for a hug and grabbed her hand in the parking lot. At that time, she kept walking, but later St. Clair was still in the parking lot and again asked her for a hug. She again refused and told him to stay away from her. Alemany also wrote that St. Clair "tried to slap a wet one" on her even before she started working at Giant Eagle. Finally, she wrote that "I thought that I could handle the situation but it definitely got out of hand."

Lenson faxed Alemany's report to Larane Hulsman, Manager of Employee Relations, and discussed the report with her. The same day Alemany submitted her statement, Lenson and Zirm interviewed St. Clair about Alemany's complaint. During that interview, St. Clair said that he remembered touching a cashier's hand and that the cashier asked him to stop. He also said he remembered asking a cashier for a hug and grabbing her hand on other occasions. After the interview, Lenson issued an incident report against St. Clair for touching a cashier's hand and asking to hug her. Lenson and Zirm also told St. Clair that he was suspended and was not to come into work until an investigation had been conducted and he was contacted by store management. St. Clair's job placement specialist at the Cuyahoga County Board of Mental Retardation was apprised of the situation.

On February 17, 2003, Giant Eagle terminated St. Clair's employment for the incident involving Alemany pursuant to the progressive discipline policy set forth in the Collective Bargaining Agreement governing employee discipline at the store. Under the policy, discipline

becomes increasingly harsh for each subsequent incident report an employee receives. The first incident report results in a written warning, the second in a two day suspension, the third in a five day suspension, and the fourth results in termination. St. Clair had three previous incident reports issued against him before Alemany submitted her statement, and, pursuant to the progressive discipline policy, the fourth report resulted in termination. Following are the dates and descriptions of the previous three incident reports:

1. June 19, 2002: St. Clair was cited for using "inappropriate language and behavior with customers and fellow associates." The manager who issued the report, Nadine DeSanto, does not recall specifically the details of the inappropriate language and behavior, including whether it was sexual in nature. According to another manager who signed the report, Frank Monastra, St. Clair admitted to using profanity and "street language" in connection with this incident.

2. September 10, 2002: St. Clair was cited for asking a customer for a tip in violation of Giant Eagle's "no-tip" policy.

3. October 22, 2002: St. Clair was cited after a customer left an anonymous message with the store's customer service line, complaining that St. Clair was "constantly inappropriately" talking to the cashiers while bagging the groceries. The customer said that the topic was "inappropriate" and that the cashier was offended by the conversation. According to Frank Monastra, the customer said the topic was "sexually related," but St. Clair denied that his language had any sexual content when confronted about the complaint.

For each of the above reports, St. Clair received the prescribed punishment under the progressive discipline policy: a written warning, a two day suspension, and a five day suspension, respectively. On February 17, 2003, after Alemany's complaint and the related incident report, St. Clair's employment was terminated pursuant to the company's policy, and Lenson informed Alemany that St. Clair had been fired. Notwithstanding St. Clair's termination, Alemany felt uncomfortable about immediately continuing her employment because she was worried that St. Clair still might visit the store and possibly retaliate against her for his firing.

On February 20, 2003, Alemany sent a letter to Giant Eagle's Human Resources Department requesting a leave of absence because she felt uncomfortable about returning to work. She cited as her reasons the possibility of St. Clair visiting the store and the need to have things die down so she did not have to work under the stress of the situation. The company denied her request on the ground that it did not present "compelling reasons" as defined by the Collective Bargaining Agreement, but suggested that she participate in the company's free confidential Employee Assistance Program. After her request for a leave of absence was denied, Alemany never again appeared at work or called the store. Pursuant to Giant Eagle's policy that three absences without a phone call results in termination, Alemany's employment was terminated on March 3, 2003.[2]

## II. <u>ANALYSIS</u>

### A. <u>Summary Judgment Standard</u>

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made

---

[2] Alemany did not grieve the denial of her leave request and does not bring a claim for wrongful discharge as a result of her termination. *See infra, n. 3.*

> and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

**B. <u>Law and Discussion</u>**

Alemany brings only one claim against Giant Eagle: a claim for common law sexual harassment. Alemany expressly disavowed any cause of action arising under either state or federal

statute in her answers to Defendants' First Set of Interrogatories.[3] Her complaint alleges only a violation of "the law and public policy" of the State of Ohio, and her opposition to Giant Eagle's motion for summary judgment states that "this action was filed in state court and remains a state common law action for sexual harassment under the Ohio Supreme Court case of *Kerans* . . ."[4] Both parties use *Kerans v. Porter Paint Co.*, 61 Ohio St. 3d 486 (1991) as the starting point of their analyses, and the Court begins with *Kerans* as well. Exactly what *Kerans* stands for, however, requires some initial discussion.

### 1. *Kerans*

In *Kerans*, the plaintiff was a decorator who worked for Porter Paint Company. *Kerans*, 61 Ohio St. 3d at 487. After having been physically and verbally molested on several occasions by a Porter store manager, the plaintiff brought a claim against the company alleging a number of claims premised on that work-place harassment. *Id.* Among others, the plaintiff asserted claims for assault and battery and negligent infliction of emotional distress. *Id.* The plaintiff contended that Porter was liable for the harm she suffered because it was aware of the manager's propensity to engage in lewd and unwanted advances against Porter employees, yet took no action. *Id.* at 492-93. Specifically, the plaintiff asserted that the company was notified that its manager had harassed and molested five other employees on as many as eight occasions and had refused to discipline the

---

[3] Alemany raises a claim for unlawful retaliation for the first time in her brief in opposition to Giant Eagle's motion for summary judgment. Because Alemany did not include this claim in her complaint, and because she has consistently narrowed her case to only a claim for common law sexual harassment, she is now precluded from arguing a claim for unlawful retaliation at this point in the proceedings.

[4] Although no federal claim has been asserted, the case is before the Court under 28 U.S.C. § 1332, the Court's diversity jurisdiction.

manager. *Id.* at 494. Indeed, the record showed that Porter had treated the prior incidents as harmless and let the offending manager know that it viewed them in that light. *Id.* at 493.

In response to the plaintiff's complaint, Porter sought summary judgment on grounds that it could not be held liable for its employee's intentional acts because the those acts took place outside the scope of his employment. The Ohio Supreme Court rejected the defendant's attempt to avoid liability to the plaintiff, holding, in a 4-3 decision, that,

> where a plaintiff brings a claim against an employer predicated upon allegations of workplace sexual harassment by a company employee, and where there is evidence in the record suggesting that the employee has a past history of sexually harassing behavior about which the employer knew or should have known, summary judgment may not be granted in favor of the employer, even where the employee's actions in no way further or promote the employer's business. An employer has a duty to provide its employees a safe work environment and, thus, may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees . . .

*Id.* at 492-93. The dissent treated the majority's holding as one creating a new tort for common law sexual harassment. *Id.* at 496-97 (Holmes, J., dissenting). Ohio state courts have subsequently seized on the dissent's characterization and have stated that "[i]n *Kerans* . . . , the Ohio Supreme Court announced a common law right to sue for sexual harassment." *Barney v. Chi Chi's, Inc.*, 84 Ohio App.3d 40, 43 (1992); *see also Tschantz v. Ferguson,* 97 Ohio App.3d 693, 708-09 (1994) (citing *Kerans* for proposition that "Supreme Court of Ohio has recognized that the employee may be entitled to redress based upon a common law action for sexual harassment"). State courts in Ohio have also held, however, that "[c]ase law subsequent to the *Kerans* case has uniformly limited the *Kerans* case to its facts." *Browning v. Ohio State Highway Patrol*, 151 Ohio App.3d 798, 813 (2003).

Federal district courts sitting in Ohio, however, specifically the Northern District, have read

*Kerans* more narrowly, concluding that *Kerans* "appears" not to have created a new tort for sexual harassment, but "instead appears to have advanced a new legal basis for employer liability for existing torts." *Baab v. AMR Services Corp.*, 811 F. Supp. 1246, 1266 (N.D. Ohio 1993) (Bell, J.). In *Baab*, Judge Sam H. Bell reasoned that *Kerans* merely recognized the principle that an employer can be liable for a negligent, reckless, or intentional failure to protect workers from improper conduct by co-workers where the facts indicate that the employer was aware of and could have prevented egregious harm to the employees. *Id.* at 1267. Thus, Judge Bell concluded that, where a co-worker commits an intentional tort (assault, infliction of emotional distress, etc.), and the employer either encourages or intentionally turns a blind eye toward such behavior, the employer can held vicariously liable for the actions of its employees. *Id.*

In *Grigaliunas v. Rockwell Int'l Corp.*, 1999 WL 681509 (N.D. Ohio 1999) (Carr, J.), Judge James G. Carr went further and concluded that the sexual harassment claims before him were governed solely by the standards governing Title VII claims, concluding that,

> In *Baab*, the court held that the decision in *Kerans v. Porter Paint Co.*, 61 Ohio St. 486 (1991), on which plaintiff relies, did not create an entirely new tort. (citation omitted) . . . Because "common law sexual harassment" is not an independent tort, I shall grant defendant's motion for summary judgment with respect to the ninth claim of plaintiff's complaint.

*Grigaliunas*, 1999 WL at *5 (citing *Baab*, 811 F. Supp. at 1266). Along the same lines, Judge David A. Katz has determined that, while *Kerans* appears to expand employer liability for existing torts, it only does so in extreme circumstances, finding that *Kerans* permits "claims for negligent infliction of emotional distress predicated on workplace sexual harassment only where the harassment complained of was of such severity as to constitute a felonious sexual assault under Ohio law." *Griswold v. Fresenius USA, Inc.*, 964 F. Supp. 1166, 1173 (N.D. Ohio 1997) (citing a case where

a supervisor had a criminal conviction for indecent exposure).

Whether one examines Ohio case law or federal case law, one thing is clear - independent tort or not, liability under *Kerans* only exists where the facts at least approach those present in that case - i.e., where an employer knowingly allows egregious and offensive sexual misconduct to continue and, thus, places its employees at risk of harm from such conduct.[5] Thus, absent: (1) knowledge of prior misconduct by the co-worker; (2) which was both sexual in nature and egregious; and (3) a failure to take steps to prevent repetition of such conduct, an employer is not liable under *Kerans*.

**2. Discussion**

Even if this Court were to find that *Kerans* created an independent tort of common law sexual harassment, the case at bar presents a situation in which the employer, as a matter of law, cannot be held liable under such a claim.

In this case, St. Clair received three incident reports prior to Alemany's complaint to management. Only the first and third reports even merit examination as to whether St. Clair engaged in sexual conduct that would have put Giant Eagle on notice that St. Clair had any history

[5] Giant Eagle does not argue that this Court should find in its favor simply because there is no independent tort for common law sexual harassment. Instead, it assumes such a tort exists in certain circumstances, but argues that those circumstances simply do not exist here.

of sexually harassing behavior.[6] In response to those reports, Giant Eagle administered the most severe discipline allowed under the company's progressive discipline policy, ultimately resulting in the termination of St. Clair just three days after Alemany complained to management. As discussed below, Giant Eagle's discipline of St. Clair is sufficient, as a matter of law, to preclude a finding of employer liability under the facts of this case.

**a. First Report**

The first report (June 19, 2002) cited St. Clair for using "inappropriate language and behavior with customers and fellow associates." According to Frank Monastra, a manager at the time who signed the incident report, the customer's call that triggered the report made no reference to sexual language or behavior, and he stated in his deposition that he had no reason otherwise to believe that St. Clair's conduct was of a sexual nature. Further, Monastra's questioning of St. Clair regarding the incident revealed only that St. Clair was swearing and using "street language" with some co-employees. Alemany alleges that St. Clair's language in this instance was sexual, but she does not provide any support for such an allegation. While the Court is required to view the evidence in a light most favorable to the non-moving party, Alemany has not put forward even a

---

[6] Alemany also argues that a jury could find that Giant Eagle was on notice that St. Clair engaged in sexually harassing behavior because Lenson, the human resources manager with whom Alemany filed her complaint, told Alemany that she "had complaints from other employees and cashiers of [St. Clair's] sexual advances prior to the instant complaint." As with many other arguments in Alemany's brief, the portion of the record cited by Alemany does not actually support her assertion. Alemany cites to a portion of her own deposition in which she states that "[Lenson] told me she had a problem with [St. Clair] before and that he had been suspended for something similar." (emphasis added). That statement does not indicate that the prior complaints involved sexual advances by St. Clair; indeed, the prior complaints are likely the complaints giving rise to the incident reports. As such, Alemany's argument that Lenson's statements reflect Giant Eagle's knowledge of any prior harassing behavior by St. Clair is necessarily subsumed in her argument that the incident reports themselves put Giant Eagle on notice of such behavior.

scintilla of evidence that St. Clair's conduct on June 19, 2002 was sexual in nature. She merely states that St. Clair's "language was inappropriate (sexual)." Inserting the parenthetical "sexual," without additional support or citation to any portion of the record, does not make it so. The first incident report, therefore, cannot provide a basis for finding that there is a genuine issue as to whether Giant Eagle was on notice that St. Clair had any history of sexually harassing behavior.

**b. Third Report**

The third report (October 22, 2002) cited St. Clair for "constantly inappropriately talk[ing] to the cashiers while bagging the groceries." The report itself does not reference any sexual language. Alemany, in her opposition brief, asserts merely that "Defendant purposefully failed to record that the banter was sexual in conduct," but, as support for that assertion, Alemany cites only to a portion of her own deposition transcript in which she stated that "people feel bad for [St. Clair] so they let things go and give him a little more leeway." That cite, of course, does not lend support to Alemany's assertion. Giant Eagle, on the other hand, points the Court to the deposition testimony of manager Frank Monastra, who stated that his understanding was that the customer complaint triggering the third incident report indicated that St. Clair had in fact used "sexually colorful" language. When Monastra approached St. Clair about the incident, St. Clair denied that his language was of a sexual nature. Based on Monastra's recollection, and viewing the evidence in a light most favorable to Alemany, there is a genuine issue as to whether St. Clair used sexual language in the incident that formed the basis for the third incident report. The question remains, however, as to whether that issue is a "material" one. The Court finds that it is not.

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson,*

477 U.S. at 248. In this case, even if it is determined that St. Clair used sexual language in the incident giving rise to the third report, that one incident is not enough to find that Giant Eagle should have been on notice that St. Clair had a "past history of sexually harassing behavior." Even if a fact-finder determines that it is enough to put Giant Eagle on notice, Giant Eagle's response to the report (suspending St. Clair for five days) is sufficient enough that the outcome of the lawsuit would not be affected. The Ohio Supreme Court in *Kerans* stated that an employer "may be independently liable for failing to take corrective action against an employee who poses a threat of harm to fellow employees," and the employer "may not sit idly by and do nothing." *Kerans* at 493. Here, Giant Eagle did take "corrective action" and did not "sit idly by and do nothing" – specifically, it suspended St. Clair for five days, which was the maximum, and only, punishment available to it under the company's progressive discipline policy.

Discussing the sufficiency of corrective action taken by employers, the Ohio Supreme Court in *Kerans* explained that "[t]he appropriate response, which may range in severity from a verbal warning, to a transfer, to a temporary suspension, to a firing, will depend on the facts of the particular case, <u>including the frequency and severity of the employee's actions</u>." *Id.* The facts of this case indicate that St. Clair's actions were neither frequent enough nor severe enough to raise a genuine issue that the corrective action taken by Giant Eagle was not sufficient, even if a fact-finder determines that the third incident report put Giant Eagle on notice that St. Clair had a history of sexually harassing behavior. In this case, St. Clair had been employed by Giant Eagle for more than two years before receiving any kind of complaint. As discussed above, the Court finds that only one complaint (the complaint giving rise to the third incident report), prior to Alemany's complaint, alleged behavior that was arguably of a sexual nature, so it cannot be said that St. Clair

"frequently" engaged in inappropriate behavior.

St. Clair's behavior, moreover, is not nearly as severe as the behavior involved in *Kerans* and other cases after *Kerans*. In *Kerans*, for example, the defendant company was aware that one of its supervisors had sexually molested multiple female employees prior to that lawsuit, including grabbing the breasts of an employee four times. *Id.* at 493-94. In that case, the company dismissed the supervisor's past behavior by stating that "boys will be boys" and suggested that his co-workers take him out to "get his rocks off." *Id.* Thereafter, Kerans herself was subjected to repeated and aggressive physical and verbal assaults, including the grabbing of her breasts and forced contact with her co-worker's genital area. *Id.* at 487. If *Kerans* is to be limited to those egregious facts, as suggested by *Browning v. Ohio State Highway Patrol*, 151 Ohio App.3d 798, 813 (2003), then it certainly cannot form the basis for liability in the present case. At most, St. Clair was accused of using sexually inappropriate language in the past. As to Alemany herself, moreover, St. Clair was accused of grabbing her hand, asking her for a hug, and telling her she was pretty. While those actions are all inappropriate, they certainly are far from the level of behavior found in *Kerans*. Giant Eagle also disciplined St. Clair after each incident report, including suspending him for five days after his third incident report, and ultimately firing him within three days of Alemany's complaint. The defendant company in *Kerans* did nothing. Even if the holding in *Kerans* is not limited to its facts, Giant Eagle's discipline of St. Clair was clearly sufficient, especially given the infrequency and relatively mild severity of St. Clair's actions.

As discussed above, there is fair debate over whether *Kerans* even created an independent tort of sexual harassment as plaintiff contends. *See Baab*, 811 F. Supp. 1246; *Grigaliunas*, 1999 WL 681509. The Court need not answer that question, however, because it is clear, as a matter of law,

that Giant Eagle cannot be held liable under any legal theory for the actions of St. Clair in this case. The five day suspension of St. Clair after the third incident report, and the firing of St. Clair after the fourth incident report, constitute appropriate corrective action under *Kerans*. Even though the determination of what corrective action is appropriate is a "factual matter," this Court concludes that the corrective action taken by Giant Eagle in this case was appropriate as a matter of law. *See Baab*, 811 F.Supp. at 1268 (concluding that the corrective action taken by the defendant was not negligent as a matter of law, although recognizing that such a determination generally is a factual matter).

## III. CONCLUSION

For the reasons set forth above, Giant Eagle's *Motion for Summary Judgment* (Doc. #16) is **GRANTED**. This case is, therefore, **DISMISSED**.

**IT IS SO ORDERED.**

**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: February 23, 2006**